### TEXAS & P. RY. CO. v. NOLAN.

#### (Circuit Court of Appeals, Fifth Circuit. May 15, 1894.)

#### No. 217.

1. NEGLIGENCE—AVOIDING CONSEQUENCES OF CONTRIBUTORY NEGLIGENCE.
   The rule that plaintiff cannot recover if himself guilty of negligence contributing to his injury, though not applicable where defendant, by the exercise of reasonable care, might have avoided the consequences of plaintiff's negligence, applies, without qualification, where the party inflicting the injury is not chargeable with negligence indulged after the position of the injured party was discovered, or, by the exercise then of reasonable care, would have been discovered.

2. APPEAL—HARMLESS ERROR—INSTRUCTIONS.
   Giving an instruction not applicable to the case cannot be held to have injured defendant, where other instructions gave the correct rule, and the jury could not have found for him under any proper instructions.

In Error to the Circuit Court of the United States for the Eastern District of Texas.

This was an action by the widow of James Nolan against the Texas & Pacific Railway Company for damages for the death of said Nolan. At the trial the jury found for plaintiff, and judgment for plaintiff was entered thereon. Defendant brought error.

T. J. Freeman, for plaintiff in error.

R. C. De Graffenried, for defendant in error.

Before McCORMICK, Circuit Judge, and LOCKE, District Judge.

McCORMICK, Circuit Judge. This is a suit by the widow of James Nolan, on her own behalf and for their four minor children, to recover damages for the killing of her husband. James Nolan was a locomotive engineer, about 40 years of age, and had worked for the Texas & Pacific Railway Company about 20 years. For 7 or 8 years just before and up to January, 1893, he had run, as a locomotive engineer for that company, in and out of Longview junction, the point in Texas where the International & Great Northern Railway Company's road intersects that of the Texas & Pacific. His family, the defendants in error, resided in Longview junction. Their home was near the passenger depot at that place. This depot is a union depot. At this point the course of the main track

of the Texas & Pacific Railroad is east and west. Just north of this depot are the main track, and a number of switch tracks parallel to the main track. These switch tracks extend about 200 yards west of the depot, and east of it to their connection with the main track. South of the depot are the tracks of the other company. About 30 feet west of this depot, crossing all of these tracks at a right angle, runs a road crossing, 19 feet wide, in constant and frequent use by the general public. The village at Longview junction and the town at Longview station, a half mile further west, blend into each other, and, between them, contain three or four thousand inhabitants. Longview junction is 45 minutes' run west of Marshall. On the morning of July 22, 1893, James Nolan and his wife went to Marshall on the train. She intended to remain at Marshall over night, and he intended to return to their home by the train leaving Marshall at 4 p. m. on that day. He missed that train by a few minutes, and had to wait for the 12:30 train that night. He boarded that train, and took a seat in the smoking apartment of the sleeper. The waiter on the sleeper was in that apartment, asleep. When the porter of the sleeping car came in, he asked Nolan if he wanted a sleeper. Nolan did not answer. Just then the conductor entered, and said to the porter: "Let him alone. He is only going to Longview. He is an old engineer; has been down to Marshall, and is going home." On arriving at Longview junction the train conductor came back in the sleeper for the purpose of getting Nolan off, and the conductor and the porter took Nolan by the arm, and put him off the train. The porter thought Nolan was drunk. Nolan had several bundles under his arm and in his hand. The train was standing on the second track north of the depot, so that the engine stood on the roadway, 30 feet west of the depot. Nolan had to take this roadway to go to his home, which was two or three blocks north from the depot. On the first track north of that on which the train stood, cabooses were blocked both east and west of the roadway, with only about 16 feet clear over the roadway. The engine was breathing with a loud noise, and was popping off steam. On the second track north of the one on which the train stood, a yardman in charge of a switch engine at or near the west end or head of this track, about 175 or 200 yards west of the roadway, was engaged in kicking cars across the roadway to be coupled to companion cars east of it. Near the crossing there was a switchman to catch the detached car when it was kicked east, and couple it to the train that was making up. North of this track on which they were making up a train the tracks were blocked with cars so that the view north was obstructed, except along the line of the roadway. When Nolan had been assisted off the train he immediately passed west alongside the train until he reached the roadway, and then turned north on it, going towards his home. He was struck by a box car being shot across the roadway, run over, and instantly killed, within three minutes of the time he was put off the train. The place where he was killed was very dark. There was no light or person on the car that struck him.

No signal, by light or sound, was given of its coming. There were nine feet between this track and the one on which the cabooses were blocked. Until Nolan had passed the track on which the cabooses were blocked, he could not have seen the car that struck him. The engine of the passenger train was making so much noise that he could not have heard the noise made by the moving of the car that struck him. The line of the track on which this car moved was so dark that the switchman placed to look out for it did not see it, or see Nolan until the car was right on him,—within 15 feet of him,—running at the rate of 5 or 6 miles an hour or more. When this switchman saw Nolan and the car, at the same instant, Nolan appeared to be looking ahead, in the direction of the road he was on. When the car had passed on, Nolan's body was between the rails; his head towards the west, near the west line of the roadway, his face down, and his right arm across the north rail of the track. There is some conflict in the testimony as to whether Nolan was drunk. This being substantially all the evidence offered in the case, the railway company requested the court to give the following special charges, numbered, respectively, 1 and 5:

"It being manifest from the evidence in this case that the death of James Nolan was the result of his own contributory negligence, the plaintiff is not entitled to recover, and you will return a verdict for the defendant." "You are charged, gentlemen of the jury, that the plaintiff, in her petition, alleges, as the acts of precaution taken by James Nolan before stepping upon the track, that, 'before stepping upon the track upon which he was struck, he did carefully look and listen and watch to see if any cars were approaching;' and you are charged that under the facts of this case the language used in the petition, above quoted, states the measure of care required of him before stepping upon the track; and if you believe from the facts that he did not 'carefully look and listen and watch to see if any cars were approaching' before he stepped upon the track, and that such acts of care on his part would have apprised him of the danger in time to have averted it, the plaintiff cannot recover."

—Which the court refused to give.

A part of the court's general charge was as follows:

"The general rule of law applicable to a case of this character is that it is the duty of the defendant to provide safe approaches to and from its depot. By the term 'safe' is not meant that the ground at the crossing itself is in perfect condition, but it has a broader meaning. It means that it must be safe, not only in construction,—reasonably safe,—but also that it will be kept in that condition, and free from foreign objects passing over it while parties traveling are departing and arriving in a reasonable time and in a reasonable manner, and as they are necessarily expected to arrive and depart. As to what is diligence,—proper diligence,—in any case of that character, depends largely upon the surroundings. At a depot where it is remote from population, and where there are few arrivals or departures, less diligence would be necessary than in a place where arrivals are frequent and large. As to whether a flagman and light would be necessary would depend upon the same conditions. In a large and crowded city, where parties are passing frequently, and may be reasonably expected to pass frequently, it requires a higher degree of diligence than in a place that is seldom used. As applied to this particular case, if the evidence shows that the place where the train stopped, and where Nolan left the train, was one frequently used,—often used,—then in that state of case the general rule would be that it would be the duty of the defendant to use that degree of care commen-

surate with the probable danger. It might be necessary to have a flagman. It might be necessary to have a light. It might be necessary that the train should not be turned loose, without a brakeman to control its motion, when it was kicked up a siding. As to all these matters, I regard them as questions for the jury, and not for the court. You are instructed it would be the duty of the company, if you believe from the evidence that the passenger traffic was such there that trains were frequently passing out and in, and that was a natural approach to or from the depot, and one provided by the company, that before the company could turn loose a car, without means of stopping it, it would be its duty to use all reasonable precautions to give notice of the approach of such a train, to prevent injury to any party that might be passing on this crossing; and if the company should fail to use such diligence, and a party was injured in consequence, the company would be liable, unless the right of action was defeated by contributory negligence, which I will now speak of."

The court gave special charges requested by the plaintiff, as follows:

"No. 2. Although the rule is that, even if the defendant be shown to have been guilty of negligence, the plaintiff cannot recover, if Nolan himself is shown to have been guilty of contributory negligence which had something to do in causing the accident, yet the contributory negligence on Nolan's part would not exonerate the defendant railroad company, and prevent the plaintiff from recovering, if it be shown that the railroad company might, by the exercise of reasonable care and prudence, have avoided the consequences of Nolan's negligence. No. 3. Upon the issue of contributory negligence the burden of proof is on the railroad company, defendant, to show that plaintiff was negligent, and that his negligence contributed to the injury."

To the refusing of each of said special charges asked by the defendant, and to the giving of said portions of the general charge, and the giving of special charges 2 and 3 asked by the plaintiff, the defendant below duly excepted. There was a verdict and judgment for plaintiff. The defendant sued out this writ of error, and assigns as error (1) the refusal to give its requested charge No. 1; (2) the refusal to give its requested charge No. 5; (3) the giving of the plaintiff's special charge No. 2; (4) the giving of that portion of the general charge to the giving of which the defendant excepted; (5) the giving of plaintiff's special charge No. 3.

If we have not misconceived the effect of the testimony, the first two of these assignments do not require any notice, further than to say that it is difficult for us to conceive in what light this evidence could be so set or read as to make it appear, to able lawyers, to warrant the asking of these requested charges.

We pass, for notice further on, the third error assigned. The action of the court complained of in the fourth and fifth specifications of the assignment of errors was substantially correct. It is supported by the decisions of the supreme court, and by accepted precedents and text writers cited in the opinion of that court. Railway Co. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, and authorities therein cited.

The action of the trial court complained of in the third error assigned appears to us to be subject to the criticism suggested by counsel for plaintiff in error in their printed brief, and in Mr. Freeman's oral argument. The language of the given special charge is in substance, and almost literally, similar to a charge

passed on by the supreme court in Coasting Co. v. Tolson, 139 U. S. 558, 11 Sup. Ct. 653, where that court announces that "the qualification of the general rule, as thus stated, is supported by decisions of high authority, and was applicable to the case on trial." In the case just cited the agents of the defendant company saw the position of the party injured before he was injured. They were acquainted with the locality, and qualified to judge of the hazard of his position, and might have had the boat so handled as to have avoided the injury. The general rule and the qualification are also announced in the Ives Case, above cited, at page 429, 144 U. S., and page 679, 12 Sup. Ct., with citations of authority supporting it, beginning with Davies v. Mann, 10 Mees. & W. 546, in which the qualification was first announced. In this earliest case the plaintiff had turned his animal loose to graze on the highway, with the animal's forefeet hoppled so that he could not readily get out of the way of passing wagons. The servant of the defendant either saw the animal, or could have seen him in time to have avoided the injury if he had moderated his pace to a careful one. We think a careful examination of the cases will show that the general rule, without the qualification, applies in all cases where the party inflicting the injury was not chargeable with negligence indulged after the position of the injured party was discovered, or, by the exercise then of reasonable care, would have been discovered. In this case the proof tends to show that Nolan knew the custom of the company in doing such work in this yard. His knowledge of that custom did not relieve it of its negligent character if, under the circumstances there, it was negligent, but it imposed on him a higher degree of care. If, with this knowledge on his part, and the duty it devolved on him, the antecedent want of ordinary care on the part of the defendant can be held sufficient to entitle the plaintiff to recover, notwithstanding his negligence contributed to cause his death, it would be idle to inquire whether or not he was guilty of contributory negligence. Such a construction would not qualify the settled rule. It would destroy the rule. There is no proof of any other or subsequent want of care on the part of the defendant, and hence, while the qualification may be held now to be as well settled as the rule itself, in our opinion, it was not applicable to the case on trial. It appears, however, from explanations inserted by the trial judge into the bill of exceptions tendered by the defendant, that in other parts of the general charge than those excepted to by the defendant, and in special charges 2, 3, and 4 requested by the defendant, and given by the judge, the correct rule was given to the jury. We are, moreover, unable to see how the jury could have found for the defendant, in this case, under any proper instructions. While, therefore, we cannot approve of the requested charge under consideration, as applicable to the case on trial, it seems clear to us that it cannot have injured the defendant. The judgment of the circuit court is affirmed.